UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JUDITH CLINTON,
*Plaintiff,*
v. **C.A. No. 1:26-cv-00510-JJM-RLA**
STEPHEN BROUILLARD, ESQ., TODD ROMANO, ESQ., VIGILANT INSURANCE COMPANY, JEFFREY PASEK, DEBORAH SWIFT, NORMAN RAFSOL, KEVIN RAMPE, TOASTMASTERS INTERNATIONAL, and DANIEL REX,
*Defendants.*

FILED
NOV 10 2026
U.S. DISTRICT COURT
DISTRICT OF RHODE ISLAND

**PLAINTIFF'S RESPONSE IN OPPOSITION TO THE MOTION TO DISMISS OF DEFENDANTS VIGILANT INSURANCE COMPANY, JEFFREY PASEK, NORMAN RAFSOL, KEVIN RAMPE, AND DEBORAH SWIFT (ECF No. 39), WITH INCORPORATED MEMORANDUM OF LAW.**

Plaintiff Judith Clinton, pro se, opposes the motion to dismiss filed by Vigilant Insurance Company ("Vigilant"), Jeffrey Pasek, Deborah Swift, Norman Rafsol, and Kevin Rampe (together, the "Vigilant Defendants"). This memorandum responds only to that motion. Plaintiff's objections to the motions of the other Defendants are addressed separately, and Plaintiff has asked that the Court set a single response date for all Rule 12 motions (ECF 36).

## INTRODUCTION

The Vigilant Defendants describe this case as one against an insurer and its employees for fulfilling the insurer's obligation to defend its insureds.[1] (Mem. at 2, 28.) The First Amended Complaint (ECF 8) alleges more than that. It alleges that Plaintiff was forced to proceed without counsel from March 2019 onward, after multiple Rhode Island attorneys declined to enter the case, ¶ 31; that she was a self-represented litigant in documented psychiatric distress, facing two defense lawyers paid by the hour by institutional clients, ¶¶ 34, 46, 48–49; that she gave

[1] The Vigilant Defendants "interpret all references to 'Chubb' in the First Amended Complaint to mean Vigilant." Mem. at 1 n.1. Plaintiff accepts that reading for purposes of this motion. *See* ¶¶ 20, 81, 84a, 120a.

Vigilant's claims personnel written notice that the defense of the state case was being carried out through fraud on the state court and in violation of her federal civil rights; that the people with authority to stop it chose to keep financing it; and that the financed defense was carried out jointly with Defendant Brouillard, their agent, and Defendant Romano through the processes of the Rhode Island Superior Court. ¶¶ 34,71–75,80–84,118–120a, 133.

The motion rests on five arguments: **(1)** that this Court lacks jurisdiction under *Rooker-Feldman*; **(2)** that the Vigilant Defendants are not state actors, and this was ordinary defense of an insured; **(3)** that Count V requires class-based animus; **(4)** that the claims are untimely; and **(5)** that the state-law claims fail.

Each of Vigilant's arguments fail. Where a point is well taken, Plaintiff says so and identifies how it will be addressed. If the Court finds any pleading deficiency, the right remedy is leave to amend, not dismissal with prejudice. The First Amended Complaint is Plaintiff's only amendment, and was made at the Vigilant Defendants' request, no court has yet found a defect in it.

## BACKGROUND

Plaintiff relies on the allegations of the First Amended Complaint, which the Court must accept as true. The Vigilant Defendants agree that, for this motion, the Court takes the facts alleged as true and may consider the public docket of the state case. (Mem.at 3 n.2) (citing) *Watterson*, v *Page* 987 F.2d 1, 3-4 (1st Cir. 1993), and *Boateng v. InterAmerican Univ., Inc.*, 210 F.3d 56, 60 (1st Cir. 2000)).

**The state case and its end.** Plaintiff sued in 2017 in Washington County Superior Court (*Clinton v. Babcock*, C.A. No. WC-2017-0376). Plaintiff does not dispute the dates and filings the Vigilant Defendants recite at (Mem. 3–6,) which they draw from the pleading and the public docket. She disputes how the recitation characterizes them. The Superior Court ruled from the

bench on June 20, 2023; the written Order was entered on September 1, 2023 (Mem. at 5) ¶ 68; the Rhode Island Supreme Court affirmed on March 24, 2025 (No. SU-2023-0310-A); reargument was denied May 16, 2025; and certiorari was denied October 20, 2025 (U.S. No. 25-63). Cert re-argument was denied December 8, 2025; The original complaint here, for § 1983, was filed July 28, 2026 (ECF 1). The Vigilant Defendants correctly note that ¶16 misstates certiorari denial dates, (Mem. at 6 n.3.) Plaintiff stands corrected and will correct accordingly.

The Vigilant Defendants present the state-court proceedings as "ordinary litigation." The pleading alleges otherwise: that it was a systematic deployment of legal process as a weapon, financed by institutional defendants with effectively unlimited resources, wielded by attorneys who had been given reason to believe the outcome would favor them. ¶¶ 32, 42, 44. The pleading alleges that judicial outcomes predictable to be in their favor, ¶¶2,32,110,139, and sustained across seven years with the deliberate intention of exhausting a self-represented litigant's health, finances, and will, before her claims could ever reach a merits hearing. The constitutional violations these facts establish are not technical infractions or the byproduct of aggressive advocacy. They are the intended result of a coordinated campaign that used the machinery of the judicial system, its procedures, its schedules, its authority, and its coercive power engineered to accomplish what the merits of Defendants' legal position could not do; ¶2 financed by the Vigilant Defendants. ¶¶9,46,87,90,97,117,137,140,142.

Plaintiff alleges that "the right to be free from conspiracy to interfere with civil rights under the First and Fourteenth Amendments, was violated through Defendants coordinated multi-year campaign, financed by institutional defendants and executed by attorney defendants, to deprive Plaintiff of due process, equal protection, access to the courts through the deliberate and systematic misuse of judicial machinery." ¶97 Plaintiff alleges that the institutionally

financed, hourly-billing litigation strategy deployed against Plaintiff as a self-represented litigant, in which every prolongation generated billable revenue with no financial downside. Plaintiff's constitutionally recognized vulnerability as an unrepresented litigant became the revenue-generating mechanism, not merely a litigation tactic. But a conspiracy in which obstruction of justice is a business model. ¶¶ 27-C,46,117,139,140 with the primary goal of exhausting her until she surrendered her claims, which she eventually did, to protect her health. ¶49.¶¶ 48–49,55, 80–84, 138. Plaintiff alleges, Defendants coordinated filings, concealment, and misrepresented facts to engineer a procedural outcome. ¶3.

The Vigilant Defendants say Plaintiff 'returns' to seek damages for civil-rights violations that 'arise from the unsuccessful pursuit of her original claims.' (Mem. at 2.) That is not what the pleading alleges, and it is not how the claims arose. Plaintiff's state claims concerned a dispute among Toastmasters members. The claims here concern what Defendants allegedly did in the course of defending that case: including fraud on the Clerk, an engineered termination, and the financing of all of it. They are claims against different parties, for their conduct, ¶138. In July 2022, Defendants rejected a proposed dismissal unless it included language waiving her appeal and § 1983 rights. ¶ 48. Her December 13, 2022, agreement contained no such language, ¶49.

The Vigilant Defendants also assert that the Complaint "asks this Court to overturn" the state decision. (Mem. at 2.) It does not. At no point does Plaintiff ask this Court to overturn the state decision. The Complaint does not allege that a neutral judicial officer simply erred in applying Rhode Island procedure. It alleges that named private parties did specific, identifiable things that independently violate Plaintiff's constitutional rights, each of which is fully documented in the Complaint and is actionable without finding that the resulting judicial ruling was legally erroneous. Whether the resulting order was correct as a matter of Rhode Island law is not the question the Complaint presents; the question is whether Defendants' conduct, independent of any correctness of the state decision, caused the deprivation of her constitutional rights. ¶12 Plaintiff addresses *Rooker-Feldman* in Part I.

**Vigilant's role as pleaded.** Vigilant insured a defendant in the state case and financed Defendant Brouillard's defense of their insured. ¶¶20,34. The pleading alleges the following about the Vigilant Defendants:

- ***Notice and authority***. On January 17, 2023, Plaintiff sent Ms. Swift a settlement demand identifying the December 27, 2022, stipulation as a fraud upon the court and warning of a § 1983 claim. Ms. Swift received it and took no remedial action except to retain outside counsel to answer. ¶ 80. One week later, Nixon Peabody LLP wrote that it had "been retained to represent Chubb and its employees, including Ms. Swift, Jeffrey Pasek, Laurie Penna, and Teresa Nehez," and rejected the settlement offer. ¶ 81. That same firm now appears for Vigilant and four individual claims employees. (ECF 4,5.)
- ***Further notice***. Before the March 24, 2023, rescission hearing, Plaintiff wrote to Mr. Rafsol asking for settlement and asserting potential § 1983 claims; he refused and did not change position after rescission was granted. ¶ 82. On April 17, 2023, Plaintiff sent Mr. Rampe, by overnight delivery with receipt confirmed, a letter stating that the decisions violating her civil rights and due process would become part of a § 1983 complaint and that "Chubb has authorized fraudulent litigation, being fully aware of unethical and illegal conduct of Defense counsel Stephen Brouillard." He took no remedial action and authorized continued financing. ¶ 84.
- ***Continued direction of the defense***. Successive defense counsel identified "Chubb" as the party making strategic decisions: "Chubb would prefer to let the appellate process run its course before determining whether it would be productive to discuss resolution." A February 1, 2024, email from defense counsel reports that "Kevin Rampe asked [Mr. Deschenes] to communicate about offers to settle the matter," and that he would continue to represent Ms. Swift on Chubb's behalf. ¶ 84a.
- ***Settlement tied to the co-defendant's exposure***. In November 2021 Chubb's adjuster Teresa Nehez invited settlement discussion; the overture was withdrawn, and two Chubb claims employees confirmed in writing that discussion was stopped on advice of counsel asserting that settling with Plaintiff would expose their insured to a comparative-negligence claim from Toastmasters International, the party Defendant Romano represented. ¶ 79.
- ***Pasek and the supervisory chain***. Mr. Pasek received the claim after Chubb's November 2021 settlement outreach was withdrawn on the advice of defense counsel. Pasek later "facilitated the execution of the December 13, 2022, Dismissal Agreement," and, with Ms. Swift, Mr. Rafsol, and Mr. Rampe, approved counsel's fees and authorized continued financing after written notice. ¶¶ 21–24, 35, 79.

## LEGAL STANDARD

On a motion under Rule 12(b)(6), the Court accepts the well-pleaded facts as true and draws reasonable inferences in Plaintiff's favor. *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (cited at Mem. 8). A facial challenge to jurisdiction under Rule 12(b)(1), which is what this motion presents, is judged the same way. *Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63, 69 (1st Cir. 2021) (cited at Mem. 8). A pro se complaint is held to less stringent standards than formal pleadings drafted by lawyers, and "specific facts are not necessary"; the statement need only give fair notice of the claim and its grounds. *Erickson v. Pardus*, 551 U.S. 89, 93–94 (2007) (per curiam); *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

Limitations is an affirmative defense. "Dismissal on that ground is proper only where the facts establishing the defense are clear on the face of the complaint and the public record and "conclusively" show the claim is time-barred." *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 16 (1st Cir. 2003). *See* Part IV. The Court has twice declined to require a more definite statement or to strike the First Amended Complaint. The text order on ECF 27 noted that the issues the movants raised "are best addressed in a motion to dismiss," and on October 26, 2026, the Court denied the Rule 12(e) motion and the motion to strike on ECF 34. Plaintiff therefore does not repeat her Rule 12(e) and 12(f) objections.

Many Vigilant Defendants' arguments rest on characterizations, such as that Defendants were "individuals simply doing their job," "mundane operations of a liability insurer and its employees," that funding and refusing settlement are "routine," and that they acted "merely under a policy, not on the facts pleaded." On a Rule 12(b)(6) motion the Court takes the well-pleaded facts as true. A defendant's description of its own conduct as ordinary is not grounds for dismissal.

## ARGUMENT

**I. *Rooker-Feldman* does not bar this action.**

**A. The doctrine is narrow.**

***Rooker v. Fidelity Trust Co.***, 263 U.S. 413 (1923) applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

Factual connection to a state court judgment is not the *Rooker-Feldman* test. The test is causation: was the injury caused by the judgment itself? Here the causation runs in the opposite direction. The pleading alleges that Defendants' conduct, much of which predates the June 20, 2023, ruling by years, caused the injury. The judgment did not cause the injury independently of Defendants' conduct. The pleading alleges that without their conduct there would be no injury. ¶29. The pleading alleges that the June 20 ruling was one of the means by which Defendants' conduct was carried out. ¶¶ 11, 60 It was not an independent judicial act that just happened to harm Plaintiff. The injury comes from that conduct, not from the ruling. The pleading alleges, it was the specific instrument Defendants engineered to prevent a merits adjudication. Not a *Rooker-Feldman* case. It's a 1983 case.

**I-B. Plaintiff brings an independent claim** The Supreme Court has since stated that the doctrine does not reach a claim that is independent of the state judgment: "if a federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party." *Skinner v. Switzer*, 562 U.S. 521, 532 (2011) quoting *Exxon* (the doctrine does not bar a federal challenge to something other than the state decision itself). The Supreme Court reaffirmed that § 1983 suits challenging conduct collateral to

state court judgments are not barred by *Rooker-Feldman*, "even when state appellate courts have reviewed the underlying proceedings." *Skinner v. Switzer*, 562 U.S. 521 (2011).

The Supreme Court's most recent decision, cited by the Vigilant Defendants, confirms how narrow the *Rooker Feldman* doctrine is. In *T.M. v. University of Maryland Medical System Corp.*, No. 25-197 (U.S. June 18, 2026), the Court restated it as "confined to cases of the kind from which the doctrine acquired its name," and described it as "the narrow ground occupied by *Rooker-Feldman*." The Vigilant Defendants cite *T.M.* for the same test. (Mem. at 8.) Under that test, the question is whether Plaintiff complains of an injury caused by the state judgment and invites this Court to review and reject it. Reviewing and rejecting the state court decision would not provide relief for Plaintiff's injury. She does not make such a request. Plaintiff seeks accountability for the conduct throughout the state court litigation that she endured for seven years and that is the cause of her injuries.

**I-C. The injury alleged is caused by Defendants' conduct, <u>not</u> by the judgment.**

The pleading is explicit about what it does not ask: "Plaintiff does not challenge whether the order's entry was procedurally proper under Rhode Island law." ¶74. The conduct alleged consists of "Defendants' own choices, provable from their own filed documents, and conduct associated with those documents, requiring no assessment of the order's correctness." *Id.* The Vigilant Defendants quote ¶11's description of the June 20 ruling as "the instrument through which Defendants' conduct produced its intended result." (Mem. at 12.) The pleading alleges that it is evidence of the intended result, not the source of the injury. The source is the conduct that produced it. A private party who obtains a judgment by fraud, or who conspires with others to do so, can be sued for that conduct without the federal court holding that the judgment was erroneous on its own terms. That is the sense of *Exxon*'s statement that an independent claim

survives even when it "denies a legal conclusion" the state court reached. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. at 294 (2005).

**I-D. It does not distinguish this case from other claims for conspiracy to obstruct justice**

The Vigilant Defendants' answer, that Plaintiff would have no injury if the Superior Court had held a trial, (Mem. at 13), does not distinguish this case. The same could be said of every claim for fraud on a court or conspiracy to obstruct justice. The question is whether this claim depends on the state court having erred, and this one does not. The injuries pleaded include seven years of financed litigation conducted through fraud and process abuse, forced self-representation, three psychiatric hospitalizations, and the costs of that litigation, mental, physical and financial. ¶¶ 31, 36, 143. Those are not injuries caused by any judgment. The pleading alleges that those injuries were caused years before any judgment.

The Vigilant Defendants cite *Klimowicz v. Deutsche Bank Nat'l Tr. Co.*, 907 F.3d 61, 66 (1st Cir. 2018). (Mem. at 13.) There, as they describe it, the claims rested on the bank "wrongfully" acquiring title that it held under the state court's judgment; the injury flowed from the judgment itself. Here the claims concern what private parties did to produce the proceedings that led to the order. *Davison* is no closer. A federal plaintiff who "alleges a constitutional violation by an adverse party independent of the injury caused by the state court judgment" is not barred. *Davison v. Gov't of P.R.*, 471 F.3d 220, 222–23 (1st Cir. 2006). The plaintiffs there challenged a fire-code order the Puerto Rico courts had upheld, and their "only real injury" was that judgment. *Id.* at 223. Plaintiff sues private parties for their own conduct and does not challenge the order's validity. ¶ 74. The Vigilant Defendants add that Plaintiff made an "explicit request to have the underlying stipulation voided." (Mem at 13.) She did not. No such request was ever made by Plaintiff. The only request made regarding a document is in ¶144(D), in the

prayer for relief. There is a request for a declaration that the December 27, 2022, second Stipulation of Dismissal was executed through fraud." This is quite a different request than the Vigilant Defendants have asserted. To clarify, it does not ask the Court to void the underlying stipulation or to vacate or declare invalid the Superior Court's September 1, 2023, Order. Plaintiff does not seek any such relief. It would serve no purpose. It is permanently extinguished.

The Vigilant Defendants also invoke the "inextricably intertwined" formulation. (Mem. at 11) (citing *Merritt v. Tiernan*, No. 23-cv-509-JJM-AEM, ECF 95 at 6–7 (D.R.I. Mar. 20, 2026)). A federal claim is inextricably intertwined only if it "succeeds only to the extent that the state court wrongly decided the issues before it." *Id.* (quoting *Hill v. Town of Conway*, 193 F.3d 33, 39 (1st Cir. 1999)). Plaintiff's claims succeed or fail on what Defendants filed, said, and drafted, not the correctness of any ruling. ¶ 74. *Merritt* is the opposite case: the plaintiff there re-asserted claims "almost identical" to counterclaims the state court had dismissed, and relief would have required undoing that judgment. *Id.* at 7–9. Here the Vigilant Defendants were not parties to the state case. The claims concern their own conduct, the state courts never decided them, ¶138, and no relief sought requires disturbing any state ruling. ¶ 74.

The June 20 decision was one of the steps through which, Plaintiff alleges, "Defendants' conduct produced its intended result."¶¶11,60,118,133. which the pleading alleges "was to prevent a merits adjudication." This is a § 1983 case, brought under the statute that gives vulnerable people a way to confront powerful institutions acting under cover of state authority. ¶ 2. Whether that joint action satisfies the state-action requirement is addressed in Part II.

**Finally,** the Vigilant Defendants stress that Plaintiff lost in the Rhode Island Supreme Court. (Mem. at 13.) That court decided whether the trial justice could reverse her interlocutory rescission and whether the December 13, 2022, stipulation could be set aside without the assent

of all parties. ¶138. Plaintiff does not ask this Court to revisit those rulings. The question here is a different one: whether Defendants' own conduct, as alleged, violated Plaintiff's rights. The First Amended Complaint alleges that the state courts did not decide that question, ¶138, and it could not have been raised on that appeal. Nor did the Supreme Court decide whether the statements Defendants made to the Clerk and the trial court, ¶¶ 63, 122–124, were true. Plaintiff acknowledges the Supreme Court's decision to affirm. However, it did not resolve whether Defendants' own conduct, alleged here, violated Plaintiff's rights, or the other matters identified, including the elements of state action. ¶138.

**II. The First Amended Complaint pleads state action.**
**A. The governing test. State action has two components.**

**First,** "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co.*, 457 U.S. **Second,** "the party charged with the deprivation must be a person who may fairly be said to be a state actor," which may be because the person "has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law. . . . It is enough that [the person] is a willful participant in joint activity with the State or its agents." That is the test applied below. *United States v. Price*, 383 U.S. 787, 794 (1966) (quoted in *Casa Marie, Inc. v. Superior Court of P.R.*, 988 F.2d 252 (1st Cir. 1993)). A private party who conspires with a state official to deprive another of constitutional rights acts under color of law. *Dennis v. Sparks*, 449 U.S. 24, 27–29 (1980).

**II-B. The pleading alleges "something more" than resort to court.**

The Vigilant Defendants add two out-of-circuit decisions for the rule that invoking state procedures does not by itself make a private party a joint actor. (Mem. at 19–20 n.7 ) (citing *Hoai v. Vo*, 935 F.2d 308, 313 (D.C. Cir. 1991), and *Schucker v. Rockwood*, 846 F.2d 1202, 1205 (9th Cir. 1988)). Plaintiff does not contend otherwise. Those decisions address a party who files papers and obtains rulings. The pleading here alleges conduct beyond invoking procedure, set out in Part II.D below. Those are specific allegations of conduct, not the "conclusory" assertions of conspiracy that *Schucker* and *Casa Marie* rejected. The Vigilant Defendants characterize their role as 'indirect,' and Plaintiff does not allege that they appeared before the Superior Court. (Mem. at 19.) Vigilant itself characterizes its role as 'involvement in the State Court Action.' (Mem. at 18.) But joint action does not turn on who stands at the podium. It asks whether private parties willfully participated, with state actors, in the conduct that deprived the plaintiff of her rights. *Dennis*, 449 U.S. at 27–29; *Adickes* 398 U.S. at 152. The pleading alleges that the Vigilant Defendants did: they financed, authorized, and kept in place the tactics that their retained counsel, their third-party agent, carried out through the court's own process and who maintained a known alignment with the co-defendant's counsel, ¶¶ 21–24, 80–84a, 118, 133, and they did so after they were made aware of the constitutional violations their agent was engaged in. "It is enough that [the person] is a willful participant in joint activity with the State or its agents." *United States v. Price*, 383 U.S. 787, 794 (1966) (quoted in *Casa Marie, Inc. v. Superior Court of P.R.*, 988 F.2d 252 (1st Cir. 1993)).

The First Circuit applied this test in *Casa Marie*. The court there held that "something more than mere resort to a state court is required to transform the moving party into 'a co-conspirator or a joint actor with the judge.'" 988 F.2d at 259 (quoting *Dennis*, 449 U.S. at 28). It

also stated the rule that matters here: "An actual conspiracy between a state court and a party attempting a plainly prohibited act would constitute 'state action.'" *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150–52 (1970)). The Vigilant Defendants rely on the first sentence. (Mem. at 16–17.) Plaintiff does not contend that resort to court alone is enough. She contends that the pleading alleges the "something more." *Casa Marie* was an appeal from a permanent injunction, and the court declined to find state action because the district court "made no findings of fact on the residents' conspiracy allegation" and "no uncontroverted record evidence supports it." *Casa Marie* 988 F.2d at 259. It was not decided on the sufficiency of a pleading. Plaintiff does not allege that Defendants merely sought rulings from a court. She alleges that through their agent, Defendant Brouillard, they used the court's own machinery, its clerk's office, its calendar, and its orders, to end a case on a premise they knew was false. ¶¶51–54, 60, 68.

The pleading also alleges why Defendants could do this. Vigilant's Defense counsel had aligned against his own clients' interest (Vigilant's insured) with the Defense counsel for Toastmasters International despite having a crossclaim for negligence against Defendant Toastmasters International, ¶¶ 37–38, 27 (Roadmap § D). taking positions that protected Toastmasters from that claim and that benefited Defendant Romano's client. Plaintiff had been forced into self-representation because the ethical toxicity of the proceedings deterred every attorney she sought to engage ¶31, and she was in documented psychiatric distress. ¶¶ 36, 46, 48–49. Defendant Romano is alleged to have said, in advance and on the record, that the court was 'on their side.' ¶¶ 32, 42, 44, 63. The pleading alleges that, against a self-represented litigant, these steps went through. ¶¶ 60, 63, 68. The pleading alleges Defendants exploited a judicial environment they had reason to believe would operate on unequal terms, as Defendant Romano's October 2021 statement confirms, filing coordinated motions, false premises, and a

concealing order into that environment with the calculated confidence that what they filed would be accepted and what Plaintiff filed would be rejected. ¶108 The pleading alleges, motions were calendared on a date set only for dispositive motions, despite vehement objections. ¶60. The pleading alleges that Romano's motion rested on one assertion, that the April 21st pre-trial conference had reinstated the Dismissal Agreement, and that assertion was false. Plaintiff documented the falsity in writing and again in oral argument,. ¶ 63. The pleading alleges that Brouillard's order was then entered verbatim over her documented objection. ¶ 68. The result was "a deprivation of process produced by falsehoods, strategic manipulation, and counsel's calculated misuse of procedural machinery to engineer a result created by manipulations of process and fabrications rather than by any lawful adjudicative process." ¶64." The pleading alleges that it was the consequence of conduct in a relationship that is so symbiotic, and consistently interdependent that it is attributable to the State. *Casa Marie* 988 F.2d at 259. ¶71

**II-C. "Independent" vs Symbiotic**

The Vigilant Defendants rely on *Santiago v. Puerto Rico*, 655 F.3d 61, 68, 71 (1st Cir. 2011), and *Cruz-Arce v. Management Administration Services Corp.*, 19 F.4th 538, 544 (1st Cir. 2021). (Mem. at 19.) Those decisions address a different question: whether the State had 'so far insinuated itself into a position of interdependence' with a private entity, such as a bus company with a state contract and federal funding, that the entity's own operations are attributable to the State. *Santiago*, 655 F.3d at 68. That is the nexus test, and *Santiago* found it unmet because a contract and public funding showed no state role in the challenged conduct. Plaintiff does not rely on that test. She relies on the joint-action test in Part II.A The one *Lugar*, *Dennis*, and *Adickes* describe: private persons who are willful participants in joint activity with the State or its agents. The question is not whether the State was entangled in Vigilant's insurance business. It is

whether these Defendants joined in the conduct alleged. They did, by their approval, authorization and payment of the conduct, they claim as mundane

The pleading alleges that Vigilant's claims personnel, Ms. Nehez and her supervisor Ms. Penna, stopped settlement discussion in November 2021 on counsel's advice that settling with Plaintiff would expose their insured to a comparative-negligence claim from Toastmasters, a rationale the pleading alleges is not explicable as independent defense strategy and is consistent with the coordinated joint action alleged. ¶ 79. After written notice, each individual Defendant had actual knowledge of the alleged fraud and the § 1983 claim, ¶¶ 80–84; Swift and Pasek had been expressly informed of Plaintiff's psychiatric condition and inability to retain counsel, ¶ 49; despite having this knowledge, Vigilant authorized and paid for the tactics carried out through the court's process. ¶¶ 21–24, 118, 133. Nor does *Santiago*'s reference to independence in 'day-to-day affairs,' 655 F.3d at 71, help the Vigilant Defendants. That factor asks whether the State controlled the private entity's own operations. It does not ask whether a private party joined with state actors in a particular course of conduct, and the latter is what the pleading alleges. A bus company that receives public funds has no such role in the conduct challenged here. The Vigilant Defendants do not make any mention of the complaint's allegation of evidence of inappropriate alignment between the two defense attorneys, (one which they were paying to defend their insured) conflict of interest, conspiracy and joint action that laid the groundwork and defined every subsequent proceeding that constitute the conduct that violated Plaintiff's constitutional rights. ¶42.

The Vigilant Defendants contend there is "no nexus between Vigilant's alleged funding and overseeing of the State Court Action… and the State." (Mem. at 17.) That asks the wrong question. The pleading does not allege that funding is the state action. It alleges that the Vigilant

Defendants financed and authorized counsel who, with the State's own officers, obtained the reopening of a closed file, the calendaring of motions on a date set only for dispositive motions, over Plaintiff's objections, and an order entered verbatim over Plaintiff's objection. ¶¶ 51–54, 60, 68, 71–75, 118, 123–125. The nexus is that joint conduct, private parties and state actors acting together in the challenged action. *Lugar*, 457 U.S. at 937; *Price*, 383 U.S. at 794. Funding is how the Vigilant Defendants made it possible. ¶¶ 21–24, 118.

**II-D. What the pleading alleges beyond resort to court.**

The joint-action allegations are at ¶¶ 71–75 and are supported by specific facts, not labels:

1. ***Misrepresentation to the Clerk.*** The pleading alleges, Defendants caused the Clerk to reopen a closed file by representing that "remaining claims" existed, affecting Plaintiff's case without her knowledge or consent. The pleading alleges that was false: the December 13 agreement covered all claims, crossclaims and counterclaims under the docket, and the third-party complaint had been superseded by a crossclaim years earlier, a fact Brouillard admitted in writing. Both attorneys knew this when they signed the first agreement and again when they drafted the second. ¶¶ 34(10), 49, 51–54, 122–124. Obtaining a state official's act on a representation the pleading alleges Defendants knew was false is the kind of "significant aid from state officials" that *Lugar* describes. 457 U.S. at 937.

2. ***Process timed to displace pending motions***. The pleading alleges, Two non-dispositive motions were calendared for a date set for dispositive motions only, over Plaintiff's vehement objection, so that the pending dispositive motions were displaced despite an agreement to hear only dispositive motions in that hearing. ¶¶60, 108,118(e), 133.

3. ***Alleged Foreknowledge of the outcome***. Defendant Romano is alleged to have stated, in advance and on the record, that the court was "on their side." ¶¶32, 42, 44, 63. The pleading ties that foreknowledge to the patterns that followed, ¶119, and alleges that Defendants accepted the outcome 'without a word of objection or clarification.¶ 69. in fact, objecting to Plaintiff requesting that the Order include language that described the mechanism the order was based on, is consistent with this pattern. ¶¶ 69–70. Plaintiff's objections, the pleading alleges, refuted each assertion in Defendants' dispositive motions, and neither Defendant replied to them, (abnormal conduct) ¶62. After the ruling, which mooted the dispositive motions, neither sought clarification, objected to relief on grounds their own motions had not requested, or expressed surprise. ¶70. The pleading alleges that this conduct is itself evidence that the outcome was anticipated. *Id.*

4. ***The Order***. The pleading alleges, Defendants drafted and obtained entry of the order that "concealed the mechanism of termination." ¶¶ 68, 73–74, 118(h). The pleading identifies a four-part sequence documentable from the court record without inference: (a) a false factual narrative (¶¶63,75); (b) relief granted on the motion that rested on that false narrative (¶¶62,75); (c) Defendants' acceptance of that relief without objection, clarification, or surprise (¶ 70); and (d) Defendant Brouillard's drafting of the order memorializing the relief, which was entered after Plaintiff's documented objection (¶¶ 65–68,73,75), The Order is evidence of what Defendants did, ¶¶ 68,73–74.This Court is not asked to review it.

Each of these acts, viewed in isolation, might be characterized as aggressive but permissible litigation tactics. Viewed together, with many others they are not. Coordinated in timing, sustained across seven years, financed by institutional clients with unlimited litigation budgets ¶ 7, and carried out by attorneys who had been given reason to believe the outcome would favor them regardless of the merits (¶¶32,42,44,133). They were directed at a self-represented litigant who could not retain counsel because attorneys who reviewed the file concluded that entering the case would trigger mandatory reporting obligations under Rule 8.3(a). ¶31. The pleading alleges, together, they are the overt acts of a conspiracy to deprive Plaintiff of due process through the deliberate misuse of judicial process. ¶¶118,133. Conduct long before the June 20, decision. These are allegations of coordinated action, by private parties with and through the court's own process. It is the "something more" that distinguishes this case from a defendant who simply files papers and loses or wins, or the characterization the Vigilant Defendants use of the choice to defend rather than settle. The Vigilant Defendants say that 'none of the Vigilant Defendants had any obligation whatsoever to take Ms. Clinton's claims and settlement demands at face value over the opinions and guidance of the counsel Vigilant hired to defend the insured.' Defendant Brouillard. (Mem. at 28.) That confirms whom they credited. The pleading alleges that Vigilant had been told in writing, repeatedly with specifics, that the counsel it was crediting was engaged

in 'unethical and illegal conduct,' ¶ 84, that the second stipulation was 'a fraud upon the Court,' ¶80, and that it nonetheless kept authorizing his work. ¶¶80–84. Plaintiff does not contend that an insurer must accept a claimant's demands at face value. The question on this motion is: whether, after written notice of specific fraud, while also being aware of the alignment with the attorney paid to defend Toastmasters International, (which the insured had a claim of negligence against as a defense for the actions she took that damaged Plaintiff,) and their decision to continue to finance the operations conducted by this same individual, plausibly makes them participants.

**II-E. The pleading ties the Vigilant Defendants to that joint action.**

The Vigilant Defendants say the pleading alleges only that they funded a defense and did not settle. (Mem. at 15–21.) The pleading alleges more:

- ***The settlement overture***. In November 2021 Chubb's adjuster invited settlement discussion. The overture was withdrawn, and two Chubb claims employees confirmed in writing that discussion stopped on advice of counsel that settling with Plaintiff would expose the insured to a comparative-negligence claim from Toastmasters International, the party Defendant Romano represented. The claim was then transferred to Mr. Pasek. ¶¶ 35, 79. The pleading alleges that this reason is "not explicable as ordinary, independent defense strategy" but "consistent with, and further evidence of, the coordinated joint action alleged." ¶79. This is further evidence of inappropriate alignment between the two defense attorneys, (one they were paying to defend their insured) conflict of interest, conspiracy, and joint action that was economically driven.

- ***Financing with direction***. The tactics of Defendants Brouillard and Romano are alleged to have been "financed" and "authorized" by Vigilant with knowledge. The pleading alleges that when "an insurer's retained attorney blocks the insurer's own claims adjuster from settling, directs the litigation strategy over the insurer's own personnel, and does so in a forum he has predicted will rule in his favor regardless of the merits, the insurer is no longer a neutral financing party. It has become a participant in constitutional deprivation." ¶ 133 (Count IX).

- ***Notice and authority***. After written notice of the fraud and the § 1983 claim, each of the four individual Vigilant Defendants is alleged to have had actual notice and authority to halt the financing, and to have continued it. ¶¶21–24, 80–84. Chubb's retained counsel's own emails identify Chubb as the party deciding whether to "let the appellate process run

its course." ¶84a. When Pasek, also an attorney was assigned to the claim, Plaintiff provided him with court documents that informed him of the conduct she alleges. ¶44,81,120.

- ***The sequence.*** Financing continued, despite their defense counsel refusing at all times to negotiate settlement with multiple documented attempts by Plaintiff and objecting to multiple motions for mediation; settlement was refused for seven years, and the conduct pleaded at ¶ 118(a)–(h) occurred during that time. ¶¶118, 133.

The pleading also alleges that Defendant Brouillard, whose clients had asserted a negligence crossclaim against Toastmasters International, ¶30, took positions in the state case that protected Toastmasters from that claim and that benefited Defendant Romano's client, not his own, (the insured). When Plaintiff proposed that his clients align with her on that claim, after he produced a document to her that supported their claim of negligence against Toastmasters, he threatened sanctions, opposed her joinder motion, never pursued the crossclaim, and served no discovery on Toastmasters, and his clients avoided answering deposition questions about Toastmasters' negligence. ¶¶37–38. The pleading alleges that this identifies "evidence of inappropriate alignment, conflict of interest, conspiracy and joint action that laid the groundwork and defined every subsequent proceeding." ¶ 27 (Roadmap § D). These facts, with the November 2021 overture to settle being abruptly withdrawn on the advice of Defendant Brouillard, support the inference of an agreement. The pleading alleges that the Vigilant Defendants knew of the alignment between defense counsel and of its effect on Plaintiff, a self-represented litigant, and continued to finance it. ¶¶ 35, 79, 84, 133. The Vigilant Defendants cite ¶79 only for the proposition that Vigilant did not require its insureds to settle. (Mem. at 7–8.) They do not address the reason the complaint alleges was given for stopping settlement discussions, ¶¶ 79, 37–38. The Vigilant Defendants' own account confirms the crossclaim was asserted and the Third-party complaint superseded. (Mem.at 4.) Plaintiff has alleged this constitutes conspiracy with opposing

counsel to manipulate the outcome of the proceedings, the basis of Plaintiff's Abuse of Process claims against the individual defendants and that supports allegations of joint action. ¶38.

Whether the facts will be proven is for a later stage. At this stage the question is whether they plausibly allege agreement *Parker v. Landry*, 935 F.3d 9, 18 (1st Cir. 2019) (a conspiracy claim must "plausibly allege facts indicating an agreement among the conspirators to deprive the plaintiff of her civil rights") The alleged agreement, ¶118, and the facts from which it can be inferred, ¶¶ 79–84a, 133, meet that standard. The Vigilant Defendants also say there is no allegation that any of them communicated with a state official. (Mem. at 19.) Joint action does not require that every conspirator personally contact the court. *Adickes*, 398 U.S. at 152; *Dennis*, 449 U.S. at 27–29. The pleading alleges that the Vigilant Defendants financed, directed or approved the tactics that were carried out through the court by their retained counsel and the co-defendant's counsel. ¶¶ 80–84a. "private persons who are willful participants in joint activity with the State or its agents." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982).

**II-F. The Individual Employees are sued for their own acts.**

The Vigilant Defendants argue that an agent of a disclosed principal is not personally liable for acts within the scope of employment. (Mem.at 14–15) (citing *Cardente v. Maggiacomo Ins. Agency, Inc.*, 108 R.I. 71, 73 (1971), and *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668, 677 (1st Cir. 1998)). Defendants invoke the general rule that an agent acting for a disclosed principal is not personally liable to a third party for acts within the scope of the agent's authority. *Cardente* does not establish categorical immunity for an agent's own actionable tortious conduct. Plaintiff does not seek to hold the Individual Employees liable merely for Vigilant's obligations, nor does she rely on respondeat superior to impose liability on them. Rather, she alleges that each Individual Employee personally participated in conduct that gives

rise to liability under the claims asserted. She alleges that each person participated. Swift received the January 17, 2023 demand, directed Pasek's involvement, and arranged the response through counsel (¶¶22, 80–81). Pasek "facilitated the execution of the December 13, 2022, Dismissal Agreement" and approved fees and continued financing after notice (¶¶21,35,49). Rafsol received Plaintiff's § 1983 warning and refused settlement before and after rescission (¶¶ 23, 82). Rampe received the April 17, 2023 letter and explicit § 1983 warning, took no remedial action, and, according to defense counsel's February 1, 2024 email, was the person at whose request counsel communicated about offers to settle (¶¶24, 84, 84a). That the acts were within the scope of employment bears on Vigilant's responsibility for them (¶120a), not on the individuals' responsibility for their own conduct. Section 1983 liability turns on each defendant's "own individual actions," *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009), not on whether the defendant held final authority. *See Guadalupe-Báez v. Pesquera*, 819 F.3d 509, 515 (1st Cir. 2016); *Sanchez v. Almond*, No. 1:24-cv-00319, ECF 43 at 21 n.14 (D.R.I. Oct. 28, 2026) The Vigilant Defendants add that § 1983 requires "an affirmative link between the specific defendant and plaintiff's federal rights deprivation" and "does not provide for supervisory liability." (Mem. at 15.) Plaintiff does not contend otherwise. The pleading supplies the link by identifying what each Individual Employee did after written notice of constitutional harm: authorized and financed the continued tactics, refused settlement, and directed counsel. ¶¶21–24, 35, 49, 80–84a. That is participation, not supervision. The assertions that the "all the individual employees did was their job," and that the state docket shows "full access" to the court are outside the pleading, A 43 page docket for a claim the Defendants characterize as a "falling out" among club members, is evidence of abuse of process and a war of attrition of disproportionate degrees. ¶¶13,30,34,45,46,87,113,115,127,133,149. The injury alleged is not lack of access to a docket

but the loss of any adjudication on the merits. ¶64. Rhode Island law likewise holds an individual liable where he or she "participated in or directed the tortious act." *Ruzzo v. LaRose Enterprises*, 748 A.2d 261, 270 (R.I. 2000) (citing *Banks v. Bowen's Landing Corp.*, 652 A.2d 461, 463 (R.I. 1995); *see Brown v. Stanley*, 86 A.3d 387 (R.I. 2014)

As to Mr. Rafsol and Mr. Rampe, the motion treats them as named only in Counts III, V, and XI. (Mem. at 9.) Plaintiff opposes dismissal of them on the state-action ground addressed above. The pleading alleges that each took part, not merely that each failed to act. Mr. Rafsol refused settlement both before and after rescission was granted, and authorized continued financing. ¶¶ 23, 82. Mr. Rampe, after receiving the April 17, 2023, letter authorized continued financing and, according to Nixon Peabody's February 1, 2024 email, asked Mr. Deschenes to communicate with Plaintiff about settlement offers. ¶¶ 24, 84, 84a. If the Court finds that insufficient, Plaintiff requests leave to amend.

The Vigilant Defendants contend that "simply funding the defense of a lawsuit or refusing settlement (as alleged in ¶¶ 119–119a) is not an unlawful conspiracy… it is a routine part of the adversarial process." (Mem. at 22.) That is not what those paragraphs allege. ¶119 alleges that Brouillard demanded in writing that Plaintiff waive her right to appeal and to file a § 1983 complaint as the price of a settlement without financial consideration and made the demand just after she had been advised to present herself to the emergency room. ¶119a alleges that the insurer's stated reason for refusing to settle, confirmed in writing by its claims adjuster, was a risk of a comparative-negligence claim by Toastmasters International against the insurer's own insured, a claim that would have had to be brought by Romano's client against Brouillard's client. The pleading alleges that this reason "is not explained as ordinary, independent defense strategy." Those are pleaded facts, and the Court takes them as true. Whether they describe

ordinary strategy or coordinated action is a question for discovery, and the Vigilant Defendants' answer is a characterization, which the Court does not adopt over the pleaded facts.

The Vigilant Defendants add that the Individual Employees "did not personally fund the litigation, nor did they dictate the litigation strategy." (Mem. at 22.) That is a factual assertion outside the pleading, and it contradicts it. Pasek "authorized continued financing," ¶21; Swift "directed Pasek's involvement in obtaining the Dismissal Agreement and authorized continued financing, and strategy." ¶22; Rafsol "authorized continued financing," ¶23; Rampe "had institutional authority to halt the abusive litigation, and failed to do so," ¶24; and all four "approved Brouillard's fees without inquiry into the legality of the tactics" after written notice. ¶35. When the adjuster's November 2021 settlement outreach was "blocked by Brouillard," the claim was transferred to Pasek, which the pleading alleges "indicates a deliberate institutional decision to abandon settlement and continue financing." ¶35; *see* ¶79. Who dictated what, is a question of fact. Whether the Individual Employees set the course or left it to counsel, they had notice of being aligned with the adversary, either answer requires facts that only discovery can supply.

**III. Count V.**

**A. The Vigilant Defendants misdescribe the class and the allegation.**

The Vigilant Defendants say Plaintiff's only claimed class is 'her pro se status,' which cannot support a § 1985 claim. (Mem. at 22.) That is not what the pleading alleges. Plaintiff is a senior citizen (currently 73, ¶ 17) with a documented psychiatric condition, supported by hospitalizations and diagnoses. ¶¶ 36, 48–49. Her self-representation was not a choice; it was forced, ¶ 31: attorneys who reviewed the file declined to enter the case, and Plaintiff proceeded alone from March 2019 onward. It is the instrument through which Defendants allegedly acted on that vulnerability, ('the operative instrument of litigation strategy'), not offered here as a

separate class. ¶142. Defendants knew all of this. Before the December 13, 2022, agreement, Defendants Swift and Pasek were 'expressly informed of Plaintiff's psychiatric condition and inability to retain counsel.' ¶49. The docket shows, "hearings had been reset six times on documented medical grounds. The pleading alleges that her doctor's written request to pause the proceedings was confirmed by the clerk, that it was accepted by the judge but not acted on. ¶49. *Id.* Plaintiff then filed the dismissal pro se to protect her health. *Id.* The pleading alleges that Defendants proceeded in the face of that knowledge, extracting dismissal agreements during documented psychiatric crises and relying on the absence of counsel, itself a product of the conduct alleged, to prevent a meaningful response. ¶¶31, 48–49, 140, 142.

The Vigilant Defendants assert that Plaintiff's objections to what is described here is saying: "Plaintiff now presents" (essentially, that well-funded litigants should not be permitted to zealously advocate their positions against a pro se litigant). 1st Am. Compl. ¶142 (Mem. at 22.) The Vigilant Defendants quote the first clause of ¶142 and then replace the rest of its sentence with their own summary. The sentence they omit states the claim: "that institutionally financed counsel who deliberately deploys litigation attrition against a forced pro se litigant, with foreknowledge of judicial alignment and in the documented absence of any moderating economic pressure, crosses from aggressive advocacy into the deliberate deprivation of constitutional rights." ¶142. That is not a complaint that well-funded litigants advocate zealously. The pleading alleges something else: Zealous advocacy does not include misleading a court, false representations to the Clerk and the court, ¶¶ 63, 123–124, made after Swift and Pasek were told of her documented psychiatric condition and her inability to retain counsel. ¶49.

Contrary to the Defendant's assertion, Plaintiff's claim is not that every litigant who faces a better-funded opponent has a civil-rights claim. (Mem. at 22.) It may be true in many instances;

however, Plaintiff is only involved with her own circumstances against two much better funded litigants. Plaintiff asserts the Defendants allegedly targeted a particular vulnerability, a documented medical condition in a senior citizen, forcing her into a position of not having an advocate, and exploited her lack of counsel as the means to violate her constitutional rights. This may speak of a two-tiered justice system. However, that is a subject for a different claim. Here the issue is whether exploitation by better funded litigants using a litigation strategy that forces a senior citizen woman to be self-represented while waging a war of attrition designed to wear her out, mentally, physically and financially, until such time that she surrenders her claims as a last resort to protect her health, is evidence of § 1983 violations, and also of class-based animus under § 1985, which is addressed in Part III.B and C. Plaintiff states that no court has yet recognized this theory, ¶139; that is why it is pleaded, and it is not a reason to dismiss it.

**III-B. The pleading alleges class-based animus; Count V's incorporation clause is the only gap.**

Plaintiff acknowledges that, as to the second clause of § 1985(2), the First Circuit requires "a class-based, invidiously discriminatory animus." *Knowlton v. Shaw*, 704 F.3d 1, 11–12 (1st Cir. 2013). ECF 8 pleads that theory. Paragraph 139 presents it as "an additional and alternative basis for relief under 42 U.S.C. §§ 1983 and 1985," and ¶142 alleges that the class-based animus requirement is "satisfied here. The pleading alleges that Defendants targeted a senior citizen with a documented psychiatric condition, whose forced self-representation was the means by which they violated her rights. ¶¶17,31,36,140,142; deliberate targeting of Plaintiff's forced pro se status and documented medical condition as the operative instrument of litigation strategy." Because those paragraphs follow the numbered counts, and Count V incorporates only the paragraphs preceding it ¶116, the Vigilant Defendants read Count V more narrowly. Plaintiff does not rely on the first clause of § 1985(2). She preserves, as ¶139 states, the first-impression

theory that deliberately exploiting a litigant forced into self-representation is actionable under §§ 1983 and 1985, including where, as here, the litigant is in a class through disability, a class some courts have recognized. *See* Part III.C.

**III-C. Alternatively, Plaintiff requests leave to plead the class-based theory in Count V.**

If the Court concludes the existing count is insufficient, Plaintiff respectfully requests leave under Rule 15(a)(2) to state the theory within Count V, including the facts bearing on her age and disability. Whether persons with disabilities are a class under § 1985(3) is unsettled. Courts of appeals are divided. *Compare Lake v. Arnold*, 112 F.3d 682 (3d Cir. 1997) (mentally retarded persons are a protected class), *with Wilhelm v. Continental Title Co.*, 720 F.2d 1173 (10th Cir. 1984). The First Circuit has not decided the question. *See Aulson v. Blanchard*, 83 F.3d 1 (1st Cir.1996) (class must be a "distinctive and identifiable group") Plaintiff found one court that was presented with the proposition the treatment of self-represented litigants have been victims of historically pervasive discrimination. *Horne v. Farrell*, 560 F. Supp. 219, 226 (M.D. Pa. 1983) That court reasoned that the plaintiff had identified no evidence showing that self-represented litigants had been the victims of historically pervasive discrimination and declined to treat self-represented litigants as a class under § 1985(3). *Id.* That was in the year 1983. Now decades later, there is ample evidence to support this proposition, including independent, published assessments of access to justice for self-represented litigants in Rhode Island. The National Center for Access to Justice's Justice Index, and documentation available from the Access to Justice movement, finally recognized as a growing concern ten years after *Horne*, and for the past twenty years has grown into a nationwide movement. Plaintiff does not rest on pro se status alone. Courts have recognized that people with disabilities may be a protected class under § 1985(3). *Lake v. Arnold*, 112 F.3d 682, 688 (3d Cir. 1997), and there is also evidence of

invidious discriminatory animus here as well, fulfilling all requirements of the class. If the Court finds the theory insufficiently pled, in Count V, Plaintiff requests leave to add facts that address the concern in *Horne*. Appropriate disposition of Count V is dismissal without prejudice, with leave to amend, not dismissal with prejudice.

**IV. The claims are timely.**

**A. The Vigilant Defendants' accrual assumption.**

The Vigilant Defendants assume a three-year period for the §§ 1983 and 1985 claims (R.I Gen. Laws§ 9-1-14 (b)) and argue that each claim accrued on the date of the last act attributed to each Vigilant Defendant, with June 20, 2023, as the outer limit. (Mem. at 23–24.) Plaintiff accepts the three-year period for these claims. Section 1986 carries its own one-year limitation, 42 U.S.C. § 1986, and Plaintiff does not oppose dismissal of that claim as untimely. She disagrees with the accrual dates. The Vigilant Defendants cite no authority for dividing the injury into separate claims that accrued on the date of each Defendant's last identified act. A denial-of-access and due-process injury of the kind alleged is not complete before the proceedings that produced it end. A claim under § 1983 accrues when the plaintiff has a complete and present cause of action. *Reed v. Goertz*, 598 U.S. 230 (2023). Accrual asks when the injury was complete, not what caused it.

**IV-B. The claims accrued no earlier than the entry of the Order.**

On the most conservative view, the earliest date on which the injury occurred is September 1, 2023, when the Superior Court's written Order was entered. The Vigilant Defendants' own memorandum identifies that date as the date of "the Order" (Mem. at 5), and Plaintiff pleads the same date. ¶68. It was that Order, not the June 20 bench ruling, that the Rhode Island Supreme Court reviewed and affirmed. ¶ 138. Rhode Island allows appeals from a "final judgment, decree or order of the superior court," R.I. Gen. Laws § 9-24-1, Plaintiff's appeal was taken from the

Order entered on September 1, 2023. "Three years from September 1, 2023, is September 1, 2026. This action was filed July 28, 2026 (ECF 1). The Vigilant Defendants' reliance on the June 20 bench ruling as an outer limit (Mem. at 24) ignores that no order existed until September 1, 2023.

The Vigilant Defendants' accrual argument contradicts their own *Rooker-Feldman* argument. They say Plaintiff's injury "stems directly from the state court's decision" (Mem. at 12), entered September 1, 2023. A claim cannot have accrued on April 17 or June 20, 2023, for an injury that on their own account, did not exist until the Order was entered. They also cite no authority for either accrual date. (Mem. at 23–24.)

**IV-C. Alternatively, accrual occurred when the state litigation ended.**

Where the injury alleged is the loss of a claim through a state proceeding, the injury is not final until that proceeding ends. In *Reed v. Goertz*, the Supreme Court held that, for a procedural due process claim tied to a state-provided litigation process, the limitations period begins to run when the state litigation ends. 598 U.S. 230. Here the state litigation ended on **May 16, 2025**, when re-argument was denied after the Rhode Island Supreme Court's March 24, 2025, decision. Three years from that date is **May 16, 2028.**

**IV-D. The conduct pleaded is within the limitations period.**

Even on the Vigilant Defendants' view that each claim runs from a Defendant's last act, the pleading alleges later acts. On February 1, 2024, Nixon Peabody counsel Kurt Mullen reported that Mr. Rampe "asked him to communicate" about "offers to settle the matter," and that counsel continued to represent Ms. Swift on Chubb's behalf. ¶ 84a. That is within three years of July 28, 2026, and it shows Mr. Rampe's continued direction of the defense after he had the April 17, 2023 letter. The pleading also alleges that Defendants continued to finance and direct the defense through the appeal to the Rhode Island Supreme Court, which was decided on March 24, 2025.

¶¶21–24, 84a, 118(g). On the Vigilant Defendants' own premise, that each claim runs from the last act attributed to a Defendant, acts within the three-year period make the claims timely. Whether those later acts are separately actionable is a question of fact that cannot be resolved against Plaintiff on a motion to dismiss. *See* Part IV.E.

**IV-E. Dismissal on limitations grounds is not warranted.**

Limitations is an affirmative defense, and dismissal is proper only where the facts establishing it are clear on the face of the complaint and 'conclusively' show the claim is time-barred. *In re Colonial*, 324 F.3d at 16. Here, the complaint pleads that the Order was entered on September 1, 2023, that the state litigation did not end until 2025, and that Defendants continued to act into 2024. ¶¶ 68, 84a. Those facts do not conclusively establish a time bar.

**V. State-law claims.**

**V-A. Count VI (fraud).**

The Vigilant Defendants state that ¶¶123–124 allege false statements by Defendants Brouillard and Romano only. (Mem. at 25–26.) Plaintiff agrees that those are the statements identified there. But Count VI names Vigilant, Pasek and Swift and alleges "Defendants' coordinated misrepresentations." ¶¶121, 125. A complaint need not identify the correct legal theory. *See Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014) (per curiam). The facts pleaded support liability for participating in the fraud: Pasek facilitated the first stipulation and Swift directed his involvement, ¶¶21–22, 49, and Vigilant funded the counsel who signed the second stipulation.¶51; (Mem. at 6.) Rhode Island law holds liable one who knowingly assists another's wrongful act with shared intent. *Curtin v. Lataille*, 527 A.2d 1130, 1132–33 (R.I. 1987). The Vigilant Defendants do not address that theory. In the alternative, Plaintiff requests leave to amend to plead aiding and abetting fraud as a separate count on the same facts. Fed. R. Civ. P. 15(a)(2).

The Vigilant Defendants also argue that Plaintiff has not explained how reliance on the representation that the December 13 agreement resolved "all" claims caused her damage. (Mem. at 26.) The pleading alleges that Plaintiff relied on the agreement as written and, while under documented duress, filed the dismissal under Rule 41(a)(1)(B), surrendering her claims by closing her case, and extinguished the opportunity to have them heard as a result ¶¶55, 123.

The rescission she later sought and obtained does not erase the injury. The Vigilant Defendants' own statement of facts describes the same period as one of 'acute psychiatric distress.' (Mem. at 5, citing ¶49.) Her reliance had already closed her case, and the effort needed to reopen it was itself caused by Defendants' conduct done without her knowledge. ¶¶55–57, 123, 143. The Vigilant Defendants' own argument confirms the injury: had Plaintiff taken no action, she would have remained in the position the December 13 stipulation left her, with her case closed. (Mem. at 26.) That closure is what ¶123 pleads caused the loss of adjudication on the merits and of any settlement proceeds. The second stipulation then reopened the case and set in motion the sequence that extinguished the claims. ¶¶122,124–125. The facts are recited as history of events, not for review of the order. ¶¶11, 74.

The Vigilant Defendants further contend that the December 27 stipulation "had no impact on Ms. Clinton's legal rights." (Mem. at 26.) That is a factual assertion outside the pleading, and on a Rule 12(b)(6) motion the Court accepts the well-pleaded facts as true and draws reasonable inferences in Plaintiff's favor. *See Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12–13 (1st Cir. 2011). The pleading alleges that the stipulation was presented to the Clerk on the false representation that "remaining claims" existed. ¶¶122,124–125. It alleges that no such claims remained and that Brouillard had acknowledged the third-party complaint was superseded but refused to withdraw it ¶¶51,52–53. It alleges that Defendant Romano, acting in concert with

Defendant Brouillard, filed the second stipulation two weeks after the case was closed, "without notice to Plaintiff, without her knowledge or consent." ¶51. It alleges that a clerk's employee had concluded it was not proper to reopen a closed file, ¶54, and that the filing served an undisclosed financial purpose, supported by its express disclaimer of "no interest." ¶53. It alleges that Plaintiff had no opportunity to object, that the filing required her to respond while still unwell, and that it served a purpose not disclosed to her. ¶¶ 53, 55, 125. Whether that harm was serious is a question of fact. Vigilant's contrary view cannot be resolved on a motion to dismiss.

A filing made without notice to the one party it affects, to reopen a closed case, cannot be assumed to have had "no impact" on her. What the stipulation accomplished, and what Defendants knew and intended, cannot be resolved on the pleadings. The pleading alleges that due to resumed litigation Plaintiff required another medical excusal causing the June 5 hearing to be changed to June 20th.

**V-B. Count VIII (Rhode Island Constitution).**

Plaintiff does not oppose dismissal, as against the Vigilant Defendants only, of the freestanding damages theory under Article I, § 15 of the Rhode Island Constitution. (Mem. at 25 n.9);*see Doe v. Brown Univ.*, 253 A.3d 389, 400–01 (R.I. 2021) (applying *Bandoni v. State*, 715 A.2d 580, 595 (R.I. 1998) (declining to create damages action under Art. I, § 23 absent "the most extreme circumstances")). Any such dismissal should be without prejudice. The right secured by § 15 remains the interest protected by the Due Process Clause in the federal claim in Count VIII, which is addressed above. ¶131.

**V-C. Count XI (intentional infliction of emotional distress).**

The Vigilant Defendants reduce Count XI to the choice to defend rather than settle and argue that no act of theirs is identified and that the conduct described in ¶137 is that of

Defendants Brouillard (the agent they were paying to defend their insured) and Defendant Romano. (Mem. at 26–28.) "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law. . . . It is enough that [the person] is a willful participant in joint activity with the State or its agents." That is the test applied below. *United States v. Price*, 383 U.S. 787, 794 (1966) (quoted in *Casa Marie, Inc. v. Superior Court of P.R.*, 988 F.2d 252 (1st Cir. 1993)). Plaintiff does not contend that defending a lawsuit is itself outrageous. The pleading alleges a sustained course of conduct against a self-represented senior citizen (currently 73, ¶17) with a documented psychiatric condition, whom Defendants knew to be vulnerable. ¶¶ 31,36,46,48–49. That course included demanding, as the price of being released from the captivity of litigation that was destroying her health and had become a threat to her life at a time she had been told to present herself to a hospital emergency room, that she give up her right to appeal and to bring a federal civil rights claim, ¶¶34(8),48,119; subjecting her to more than twenty hours of depositions under conditions so threatening and aggressive that she was required to hire a private security guard for her physical safety, reported on the record; Rhode Island's Statute, § 8-8.4-6, expressly recognizes Abusive Litigation as comparable to physical violence. ¶36 ¶34(4); and then misrepresenting facts to the Clerk to reopen a closed file on a Third-Party Complaint that Brouillard had admitted in writing was superseded, and whose nominal existence he had maintained for years, against her repeated written demand, for the purpose of filing the second stipulation. ¶¶34(9–10,)52,123. The pleading alleges that this conduct was "financed by institutional defendants with actual notice of the harm being caused," and continued "after receiving notice that their tactics had caused repeated psychiatric hospitalization." ¶137. It alleges that the Vigilant Defendants had all received written notice of the alleged fraud on the state court, and hospitalizations, ¶¶ 80–84, 133, and they knew, from Plaintiff's written notices

and from defense counsel's own conduct, that the defense was being carried out in alignment with Toastmasters' counsel against a woman forced to be self-represented because attorneys who looked at the file in the court portal refused to file an appearance in such a case as it would require them to report the unethical abuse of process and unethical conduct, and continued to finance with that knowledge. ¶¶35,79,80–84,84a 133,137. When institutionally financed counsel and their insurers (the "Vigilant Defendants") knowingly deploy litigation attrition against a litigant known to be in medical crisis, they are not engaged in "zealous advocacy." They are engaged in a conspiracy to obstruct the due course of justice by ensuring the Plaintiff is medically and procedurally incapable of participating in the proceedings. Vigilant's pleading does not address the obstruction of the ethics complaint Plaintiff was stopped from making. ¶83.

Whether that conduct is extreme and outrageous is judged on the facts alleged and the defendant's knowledge of the plaintiff's vulnerability and susceptibility, and it cannot be resolved against her on the pleadings. See *Swerdlick v. Koch*, 721 A.2d 849, 862–63 (R.I. 1998). Rhode Island follows Restatement (Second) of Torts § 46 cmt.F on defendants who know of a plaintiff's susceptibility. The Vigilant Defendants characterize the state claim as beginning with "a falling out" among Toastmasters members, and they describe what amounts to seven years of tortuous litigation only as a decision to litigate or settle. (Mem. at 2.) The pleading alleges seven years of litigation that required hospitalization, medication, and ongoing treatment, and that ended with Plaintiff's surrender of her claims to protect her health. ¶¶36, 48–49. If the Court finds the claim insufficient to the Vigilant Defendants, Plaintiff requests leave to plead additional facts about their conduct. The federal claim in Count XI is addressed in Parts I–IV.

**V-D. The Court should retain the remaining state-law claims.**

The Vigilant Defendants ask the Court to decline supplemental jurisdiction under 28 U.S.C. §

1367(c)(3) if the federal claims are dismissed. (Mem. at 24–25.) That request depends on dismissal of every federal claim. If at least one federal claim remains, the Court has supplemental jurisdiction over the related state-law claims if they "derive from a common nucleus of operative fact" and are claims that "would ordinarily be expected to be tried in one judicial proceeding." *City of Chicago v. International College of Surgeons*, 522 U.S. 156, 164–65 (1997). The state-law claims here arise from the same nucleus of facts as the surviving federal claim. Retaining them also serves judicial economy, convenience, and fairness, and the Court should exercise its discretion to do so, consistent with the statutory considerations governing whether to decline supplemental jurisdiction. Id. at 172–73; 28 U.S.C. § 1367(c).

**V-E. Dismissal with prejudice is not warranted; alternatively, Plaintiff should be allowed to amend.**

The Vigilant Defendants ask for dismissal with prejudice because "Plaintiff has already amended once as a matter of course." (Mem. at 28.) The record does not support that characterization. The amendment was made at the Vigilant Defendants' own request. The original complaint named "Chubb Ltd. a/k/a and d/b/a Vigilant Insurance Company." After service on Chubb's legal department, counsel for Vigilant asked Plaintiff to amend to remove any reference to Chubb Limited and to name Vigilant Insurance Company in its place. ¶ 84a; *see* (Mem. at 1 n.1) (acknowledging the change). Plaintiff offered to make the change by stipulation. Vigilant rejected that offer and insisted the change be made by amendment. Plaintiff accepted that as a good-faith request and used the one amendment she was entitled to make as a matter of course under Rule 15(a)(1), as an accommodation. It changed the name as requested and inserted definitions to clarify the change, which the Vigilant Defendants describe as "a handful of new allegations." (Mem. at 28.) All of this preceded their motion to dismiss and the issues

they now raise. The Vigilant Defendants cannot fairly rely on that amendment as a reason to deny any further one. *See* **Exhibit A** (letter of Attorney Batastini, Aug. 18, 2026)

**VI.-A. Plaintiff challenges what Defendants did, not what the Superior Court decided.**

The Vigilant Defendants close their memorandum by asserting that Plaintiff "has been explicit throughout each iteration of her pleading that her injuries are caused by the state-court judgment." (Mem. at 28–29.) The Complaint(s) makes no such allegation, and Plaintiff does not ask the Court to overturn or review any state-court decision. The pleading explicitly asserts that Plaintiff "is not challenging the June 20 ruling as a matter of law; she challenges the process by which it was produced and the joint actions of Defendants that led up to it and caused it." ¶61; see ¶74. The pleading alleges that the process was carried out through "falsehoods, strategic manipulation, and counsel's calculated misuse of procedural machinery," ¶64, and that Defendants drafted the order that "concealed the mechanism of termination." ¶¶12,118(h); see¶¶ 9, 69.

The Vigilant Defendants invoke the "critical datum": whether this suit is "an end-run around a final state-court judgment." (Mem. at 12 (quoting *Klimowicz*, 907 F.3d at 66)); accord *Merritt v. Tiernan*, No. 23-cv-509-JJM-AEM, ECF 95 at 9 (D.R.I. Mar. 20, 2026). It is not. An end-run would re-assert the claims Plaintiff litigated in state court: defamation and emotional distress against five Toastmasters club members and the related claims against Toastmasters International. ¶¶30,131. She asserts none of them. Counts IV and IX are backward-looking access-to-courts claims of the kind recognized in *Christopher v. Harbury*, 536 U.S. 403, 413–415 (2002). ¶¶6,13,96,115. Plaintiff's underlying claims are permanently extinguished, no state forum remains, and she seeks no ruling that revives them. ¶74. She sues these Defendants for their own conduct: fraud, coordination and financing the pleading alleges extinguished those claims.

**VI-B. Finally, the Vigilant Defendants assert**, "She litigated a case in state-court and lost; she appealed to the Rhode Island Supreme Court and lost." (Mem. at 13.) Plaintiff acknowledges the RI Supreme Court's decision. That court decided whether the trial justice could reverse her interlocutory rescission and whether the December 13, 2022 stipulation could be set aside without the assent of all parties. ¶138. It did not decide whether the statements Defendants made to the Clerk and the trial court, ¶¶63,122–124, were true, or whether Defendants' own conduct violated Plaintiff's rights. The pleading alleges that the state courts did not decide those questions, ¶138, and they could not have been raised on that appeal. The pleading alleges that Defendants "secured termination of the case without adjudication on the merits" through "falsehoods, strategic manipulation, and counsel's calculated misuse of procedural machinery," ¶64, which it alleges they concealed. ¶¶9,12,69,118. This Court is asked to examine private-party conduct by different defendants, on claims no prior court decided. Discovery, fact-finding, and adversarial testing of Defendants' independent conduct can only occur here. ¶ 64.

**VI-C. Amendment would not be futile**

An amended pleading would not be futile. The Vigilant Defendants argue that no new allegations could convert an insurer into a state actor. (Mem. at 28.) Plaintiff disagrees for the reasons in Part II. An amended pleading would: **(1)** attribute each allegation to specific Defendants, separating the Vigilant Defendants from Defendants Brouillard and Romano, Toastmasters, and Rex; **(2)** to assist the Court and the parties, state the facts and Defendants each count relies on and plead the federal and state-law theories in separate counts; **(3)** add detail on the agreement and on the financing and approval of the tactics pleaded, including what the Vigilant Defendants knew, and when, about the superseded third-party complaint and about Plaintiff's medical condition before the December 13 and December 27, 2022 stipulations, and the circumstances of each stipulation; **(4)** add a count for aiding and abetting the fraud alleged in Count VI; **(5)** plead the class-based claim in Count V with the factual basis in Part III; **(6)** restate Count I to identify the conduct of each Defendant; **(7)** add dated acts and communications, including those within the limitations period, together with the supporting documents and state-court docket entries; **(8)**

add such further facts, with dates and sources, as Plaintiff has identified since filing; and **(9)** correct dates and citations and make conforming and clerical changes, including the date of the certiorari denial in ¶16 and the year of the Rhode Island Supreme Court's decision in *Clinton v. Babcock*, No. 2023-310-Appeal, which ¶¶ 88, 106 and 138 give as 2024, but was issued in 2025.

## CONCLUSION

**Plaintiff respectfully requests that the Court:**

1. Deny the motion to dismiss as to Counts I, II, III, IV, VI, IX, and X as against the Vigilant Defendants;
2. Deny the motion as to Count VIII to the extent it asserts a claim under the Due Process Clause of the Fourteenth Amendment, and, as to the Vigilant Defendants only, dismiss without prejudice the freestanding damages theory under Article I, § 15 of the Rhode Island Constitution;
3. Deny the motion as to Count XI, both the federal claim and the state-law claim for intentional infliction of emotional distress;
4. As to Count V, deny the motion, except as to the claim under 42 U.S.C. § 1986, or in the alternative, dismiss without prejudice and grant leave to amend;
5. Retain supplemental jurisdiction over the remaining state-law claims;
6. In the alternative, to the extent the Court finds any pleading deficiency, including as to Count VI, dismiss without prejudice and grant Plaintiff leave under Rule 15(a)(2) to file a motion to amend, with a proposed Second Amended Complaint addressing all pending motions and the matters described in Part IV.F, within thirty days after the later of the Court's order or the completion of Rule 12 briefing as to all Defendants; and
7. Grant such other relief as is just."

Pursuant to Local Rule Cv 7(c), Plaintiff does not request oral argument or an evidentiary hearing.

Respectfully submitted,

[signature]

Judith Clinton - Plaintiff, pro se
418 Benefit Street
Providence, RI 02903
860-389-0402 -Jclinton14@msn.com

## CERTIFICATE OF SERVICE

I certify that on November 10, 2026, I filed this document, Plaintiff's Response in Opposition to the Motion to Dismiss of Defendants Vigilant Insurance, Jeffrey Pasek, Norman Rafsol, Kevin Rampe, and Deborah Swift, **(ECF No. 39)**, with Incorporated Memorandum of law. Filed through the Clerk's office for filing in the Court's CM/ECF system and served by email to all counsel of record in this case; For Vigilant Defendants: Armando E. Batastini and Madeline Coburn, Nixon Peabody LLP, Defendant Stephen Brouillard and Defendant Todd Romano for himself and Daniel Rex and Toastmasters Int.

Signed [signature] Dated: 11-10-2026